*Argued June 8, reversed and remanded with directions July 18, 1922.*

## WOODFORD *v.* OLCOTT ET AL.

### (208 Pac. 1113.)

**Army and Navy—World War Veterans' State Aid Commission has No Discretionary Power to Reduce Amount of Loan to Qualified Applicant to Less Than Seventy-five Per Cent Appraised Value Security.**

1.  Under Constitution, Article XI–c, and Laws of 1921, pages 362, 363, 365, Sections 10, 13, 20, 21, the World War Veterans' State Aid Commission has no discretionary power to reduce the amount of a loan to any qualified applicant thereunder to less than seventy-five per cent of the appraised value of the property offered as security therefor.

**Army and Navy—"Appraised Valuation" or "Net Appraised Value" of Property Offered as Security for Loan Determined by World War Veterans' State Aid Commission.**

2.  Under Constitution, Article XI–c, and Laws of 1921, page 359, the ultimate determination of the question of the value of the property offered as security for a loan is placed upon the World War Veterans' State Aid Commission, the term "appraised valuation" or "net appraised value" meaning, under the statute, the final valuation made under the direction of the commission and accepted by it as final.

Mandamus—Will not Lie to Control World War Veterans' Aid Commission Acting Within Discretionary Powers.

3. *Mandamus* will not lie to compel the World War Veterans' Aid Commission to accept the appraisement of property offered by qualified applicant as security for loan under Constitution, Article XI-c, and Laws of 1921, page 359, the commission and not the appraisers being the final judges of the value of property; such appraisement being an official act requiring exercise of judgment and discretion.

From Marion: PERCY R. KELLY and GEORGE G. BINGHAM, Judges.

In Banc.

REVERSED AND REMANDED, WITH DIRECTIONS.

For appellants there was a brief over the names of *Mr. Arthur C. Spencer* and *Mr. I. H. Van Winkle,* Attorney General, with an oral argument by *Mr. J. A. Benjamin,* Assistant Attorney General.

For respondent there was a brief over the name of *Mr. Robin D. Day,* with oral arguments by *Mr. Brazier C. Small* and *Mr. Roy F. Shields.*

RAND, J.—The petitioner, under Chapter 201, Laws of 1921, applied to the defendants, who compose the World War Veterans' State Aid Commission, hereinafter referred to as "the commission," for a loan of $2,170 and offered as security for the repayment thereof a mortgage upon certain real property owned by him, and situate in Marion County, Oregon. Pursuant to said application the land was appraised at a valuation of $2,908 by three appraisers regularly appointed by the commission to appraise the real property in said county offered as security for loans under said act. The commission approved the application of the petitioner but declined to loan upon said security any greater amount

than the sum of $1,000, and assigned as the reason therefor that in the judgment of the commission said property was not of sufficient value to constitute adequate security for a loan in excess of the sum of $1,000. Thereupon, on his petition, an alternative writ of *mandamus* was issued to which the defendants demurred. The demurrer was overruled, and the defendants declining to plead further, an order was made and entered, directing that a peremptory writ be issued commanding the commission to loan to the petitioner upon said security the sum of $2,170, from which order the defendants appealed.

The petitioner contends: 1. That the statute itself determines the proportion which the amount of the loan must bear to the appraised value of the property tendered as security for the loan, and that where the applicant applies for a loan to the full extent of 75 per cent of the appraised value of the property so tendered, the commission has no discretionary power or authority to reduce the amount of the loan to less than 75 per cent of such appraised value. 2. That upon the question of the value of the property so tendered, the appraisement as made by the appraisers appointed pursuant to the provisions of the act is final and binding upon the commission, while the commission contends that it is clothed with discretion to see that no loans in excess of the ability of the applicants to pay, and of the property tendered to satisfy, shall be made, and that the term "appraised valuation" as used in Sections 10 and 22 of the act refers to the ultimate appraisement of the property by the commission itself, and not to the appraised valuation as made by the appraisers, unless accepted by the commission as a true valuation of the property. The determination of these ques-

tions involves a construction of Article XI–c of the Constitution, and of Chapter 201, Laws of 1921.

Among other things, Article XI–c provides as follows:

"Any male or female who was enlisted, inducted, warranted or commissioned after June 3, 1915, and who has served honorably in active duty in the army, navy or marine service of the United States at any time between the sixth day of April, 1917, and the eleventh day of November, 1918, and who at the time of entering into such service was a resident of the state of Oregon and who has been honorably separated or discharged from said service or has been furloughed to a reserve, shall be entitled to receive from the proceeds of such bonds as a cash bonus the sum of $15 for each month or major fraction thereof that such person was in active service between the sixth day of April, 1917, and the eleventh day of November, 1919, not exceeding a total of $500, or shall be entitled to borrow from said funds not to exceed $4,000, which loan shall be secured by a mortgage upon real estate in an amount not exceeding 75 per cent of the appraised value of said real estate, but which loan may be reduced by statute."

Pursuant to the authority conferred by the clause quoted above, "which loan may be reduced by statute," the legislature, by Chapter 201, Laws of 1921, prescribed that $3,000 should be the maximum amount for which the loan could be obtained.

1. Under this provision of the Constitution, the right is conferred upon every person possessing the qualifications defined in Article XI–c, upon compliance with all of the provisions of the statute, to borrow from the funds so to be created, a sum not in excess of that prescribed by statute, viz., $3,000, provided that the sum so borrowed shall not be in excess of 75 per cent of the appraised value of the real

property offered as security for the loan, and upon which a proper mortgage is tendered. The sole conditions upon which the right conferred by the Constitution depends are those prescribed by the provisions of Article XI-c and a compliance with the provisions of Chapter 201, Laws of 1921. Upon compliance with those conditions, the applicant's right to the loan becomes absolute, and it is not within the discretionary power or authority of the commission to deprive to any extent whatever, a qualified applicant of such right.

Where the Constitution prescribes that a person is entitled to borrow from a commission appointed pursuant to its terms a sum not in excess of a prescribed sum, it necessarily means that such person is entitled to borrow any sum not in excess of the sum prescribed. To place a construction upon this provision of the Constitution that the commission or any other body has the power to compel an applicant to accept less than 75 per cent of the appraised value of the real property offered as security for the loan, would result in the destruction of the right. If it should be granted that the commission has the power to limit the borrowing ability of any applicant to a sum less than 75 per cent of the appraised value of the property tendered, then it must be granted that the commission has the power to limit the amount to be loaned even to the extent of refusing to make any loan whatever. If it could be said that the commission has authority to say to any applicant that the amount he is entitled to borrow shall be reduced to less than 75 per cent of the appraised value of his property, then it would follow that the applicant is entitled to borrow, as a matter of right, only such a percentage of the appraised

value of his property as the commission itself shall fix and determine for him.

The right conferred by the Constitution is an absolute right, and its enjoyment by a qualified applicant is dependent only upon his compliance with the conditions prescribed by the Constitution, and by Chapter 201, Laws of 1921.

The contention that the commission has the discretion to reduce the amount for which a loan is to be made to less than 75 per cent of the appraised value of the property offered as security therefor, if sustained, would, to the extent of such reduction, destroy the right, and might destroy the right altogether, because if such discretion is vested in the commission, then it can in any case reduce the loan to any extent, even to the extent of refusing to make any loan at all.

It is obvious that a right, the enjoyment of which depends upon the will of another, is at best nothing more or less than an imperfect or qualified right, the existence of which depends upon the decision of someone other than the applicant himself.

Substituting $3,000 for $4,000, the amount as reduced by statute, the clause "shall be entitled to borrow from said funds not to exceed $3,000, which loan shall be secured by a mortgage upon real estate in an amount not exceeding 75 per cent of the appraised value of said real estate," means that the applicant shall be entitled to borrow any sum not in excess of $3,000 when the loan is secured by a mortgage upon real estate, and where the amount for which the mortgage is given and for which the loan is made does not exceed 75 per cent of the appraised value of such real estate.

The fact that the applicant for a loan, in the judgment of the commission, may or may not be a good moral risk is wholly unimportant so long as the real property tendered as security for the loan is of an appraised value sufficient to entitle such applicant to such loan. This fact does not in any way detract from the force of the constitutional guarantee, or limit the effect of applicant's right thereunder.

For these reasons we are constrained to hold that the commission is not authorized to reduce the amount of a loan to any applicant to less than 75 per cent of the appraised value of the property offered as security therefor, where the applicant possesses all the qualifications necessary to entitle him to such loan, and has complied with all of the requirements of Article XI–c and of Chapter 201, Laws of 1921.

The law provides for the issuance and sale of bonds payable by the state, to create a fund out of which those who, by reason of participation in the naval or military service of the country during the World War, were bound to have sustained financial loss, could at their option receive a cash bonus, or borrow a sum of money equal to 75 per cent of the security offered upon a long-time loan, at a low rate of interest, so as to assist such persons in the purchase of homes, lands or other property, and thereby better enable them to earn a livelihood and to a small extent recompense them for the losses sustained. The right to accept a cash bonus was granted by the state purely as a donation in recognition of the great moral obligation the state was under to those participating in the defense of the country.

The right to obtain a loan was based upon the same consideration of public obligation, but upon the further condition that the money loaned should eventually be repaid to the state. It was not the intent of the law that the loan should possess any of the elements of a donation. The law intended that the loan should be made upon adequate security, and that the borrower should be legally obligated to repay the borrowed money. The sole advantage that the law intended to confer upon the borrower was to provide a means whereby, upon a class of security upon which credit could not otherwise readily be obtained, the money could be borrowed upon a long-time loan, and at an extremely low rate of interest, with but small margin between the amount of the loan and the value of the property given as security therefor, which security, however, was deemed adequate by the legislature.

To carry out the purposes and objects of the enactment, the act provides for the creation of a commission to take charge of the issuance and sale of bonds, and to disburse the moneys realized therefrom in accordance with the directions of the statute. It provides that the commission shall be composed of the Governor, the Secretary of State, the Adjutant-General, and two other persons to be appointed by the Governor, one of whom must be a veteran of the World War, and a person qualified to obtain a loan under the provisions of the act. The legislature conferred upon the commission broad and general powers, and recognizing the great responsibility attendant upon the performance of the duties of administering the act, in designating the personnel of the commission, provided for its being composed of men of the highest character, standing and business quali-

fications, and directed that they should serve without pay. In the performance of its duties the commission is charged with the responsibility of disbursing money which, in the aggregate, will amount to many millions of dollars.

By Section 13, "The commission is authorized, empowered and directed to administer the provisions of this act, and shall have the power to adopt all necessary rules and regulations not inconsistent herewith to carry into effect such provisions and to employ a secretary. The commission shall adopt such forms for applications for bonus or a loan and all other forms as it may deem necessary."

By Section 20, "The commission is hereby authorized, empowered and directed to do any act or thing necessary to fully meet the requirements of this act."

By Section 21, "The commission shall appoint a board of three appraisers for each county, who shall appraise the property in such county on which loans may be applied for according to such rules and regulations as may be adopted by the commission. The commission shall also appoint an attorney, who shall examine and pass on the title to any real property upon which a loan is requested. Each appraiser shall receive a fee of not to exceed $5 for each appraisal and each attorney shall receive a fee of not to exceed $10 for each title examined, said fee to be paid by the applicant for a loan."

The act contains no clause limiting the exercise by the commission of the powers conferred upon it, and there is no provision contained in the act by which the action of the commission may be reviewed.

In Section 10, it is provided that "the loan shall in no instance exceed 75 per cent of the net appraised

valuation of such real property," and Section 22 provides: "The commission shall provide by rule for making advances to borrowers for improvements on real property to meet payments for material and labor; provided, that such advances shall be so regulated that at the completion of such improvements the total amount loaned shall not exceed 75 per cent of the appraised valuation of the real property after the completion of the improvements."

These two sections contain the only reference to be found in the act of the valuation upon which the amount of the loan is made to depend, and Section 21, above quoted, contains the only reference to the means provided by the act for the appraisement of the property.

The power to appoint three appraisers in each county is conferred by the act. The compensation to be paid the appraisers is a fee of $5 to each appraiser to be paid by the applicant, upon each appraisement.

The word "loan," as used in the statute in connection with the means provided for by the statute to secure its repayment, clearly negatives the idea of a gift, and it is obvious that it was the intention of the legislature that an enforceable obligation against the borrower was to be created in favor of the state for the repayment of the money.

The applicant, having elected to obtain a loan for a much larger amount than the cash bonus would receive a much greater benefit from the loan than the one receiving the cash bonus unless the property tendered as security for the loan should be sufficient to secure its repayment. As the loan is to be equal to three fourths of the value of the property given as security, the margin of safety to the state is

within such narrow limits that it is of the utmost importance to the state that the commission shall exercise the highest degree of care in determining the appraised value of the property upon which the money of the state is about to be loaned.

The only reference in the act to the valuation to be placed upon the property tendered as security for the loan is contained in Section 10, where the statute reads: "The loan shall in no instance exceed 75 per cent of the net appraised valuation of such real property," and in Section 22, where it is provided "at the completion of such improvements the total amount loaned shall not exceed 75 per cent of the appraised valuation of the real property after the completion of the improvements."

By the use of the terms "net appraised valuation" and "appraised valuation," the legislature clearly did not intend that the perfunctory service to be performed by the three appraisers as provided in Section 21, for which each appraiser was to receive a fee of but $5, and where but one appraisement was to be made, no matter how conscientiously those services might be performed by the appraisers, should be anything more than advisory upon the question as to the value of the property offered as security for the loan. Clearly, this must be so by reason of the fact that the sole responsibility of administering the act, and of disbursing the money, and accepting the security given for the repayment of the loans is placed entirely upon the commission.

It is reasonable to suppose that if the legislature had intended that the appraisement by the appraisers provided for in the statute should be final and binding upon the commission, the statute would have contained some provision to that effect. It is true

that the statute confers upon the commission the power to make rules and regulations governing the appraisers in their appraisement of the property, but the right of the commission to exercise this power raises no inference that the legislature intended that the appraisers, and not the commission, should be the final judges in determining the appraised value of the property. The statute makes no provisions for the appraisers to give a bond, or to be sworn to faithfully perform their duties; it requires them to make no sworn return, and makes no adequate provision for the payment of any considerable services upon their part.

The meaning of the words "appraised value" as used in the Constitution, and "net appraised valuation" and "appraised valuation" as used in the statute, must be determined in the light of the general objects and purposes of the enactment, and so as to give effect to the main intent: Black's Int. Law (2 ed.), p. 197. "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law and to its object and policy": *United States* v. *Boisdore's Heirs*, 49 U. S. 113, 121 (12 L. Ed. 1009).

2. When we look to the provisions of Article XI–c, and Chapter 201, Laws of 1921, in the light of the general objects and purposes of their enactment, it is obvious that the legislature intended that the ultimate determination of the question of the value of the property offered as security for the loan should be placed upon the commission, and that the appraisement by the appraisers is merely advisory in character, and not binding upon the commission.

The word "appraisement" has two meanings. As defined by Webster's New International Dictionary,

it means, 1, "the act of, or proceeding used in, appraising"; 2, "the value fixed by appraising." As used in this statute, the term "appraised valuation," or "net appraised valuation" means the final valuation made under the direction of the commission and accepted by the commission as final. To hold otherwise might subject the state to the ultimate loss of many millions of dollars.

3. The granting of a writ of *mandamus* is a matter of judicial discretion, and is not a matter of right. *Mandamus* is granted only where without its aid there would be a failure of justice: *Dane* v. *Derby,* 54 Me. 95 (89 Am. Dec. 722, and note); *Rex* v. *Baker,* Burr. 1267.

The established law applicable to the issuance of a writ of *mandamus* in cases analogous to the one here involved is aptly stated in *American Casualty Ins. Co.* v. *Fyler,* 60 Conn. 448, 459 (22 Atl. 494, 25 Am. St. Rep. 337), as follows:

"The principle set forth in these authorities is, that a writ of *mandamus* may issue where the duty which the court is asked to enforce is the performance of some precise, definite act, or is one of a class of acts purely ministerial and in respect to which the officer has no discretion whatever and the right of the party applying for it is clear and he is without other adequate remedy; and that the writ will not issue in a case where the effect of it is to direct or control an executive officer in the discharge of an executive duty involving the exercise of discretion or judgment. The rule is stated very clearly by Mr. Justice BRADLEY in *United States ex rel. Dunlap* v. *Black,* 128 U. S. 40 [32 L. Ed. 354, 9 Sup. Ct. Rep. 12, see, also, Rose's U. S. Notes]. He says: 'The court will not interfere by *mandamus* with the executive officers of the government in the exercise of their ordinary official duties, even where those duties

104 Or.—29

require the interpretation of the law, the court having no appellate power for that purpose; but where they refuse to act in a case at all, or where by a special statute or otherwise a mere ministerial duty is imposed upon them, that is, a service which they are bound to perform without further question, then if they refuse a *mandamus* may be issued to compel them.' The same rule is given in High on Ext. Remedies, Section 42, where that author adds: 'Indeed, so jealous are the courts of encroachment in any manner upon the discretionary powers of public officers, that, if any reasonable doubts exist as to the question of discretion or want, of discretion, they will hesitate to interfere, preferring rather to extend the benefit of the doubt in favor of the officer.' 'A ministerial act is one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act being done.' *Flourney* v. *City of Jeffersonville,* 17 Ind. 169, [79 Am. Dec. 468.]''

The appraisement of real property tendered under Chapter 201, Laws of 1921, as security for the repayment of loans to be made under said act is not a mere ministerial act, but is an official act requiring the exercise of judgment and discretion. The statute as we interpret it commits the ultimate determination of this question to the commission itself. It is within the power of the legislature to entrust the determination of this question to the commission and to make its decision thereon final. So long as the commission acts in good faith and makes, or causes to be made a fair and honest appraisement of the property, and having fixed a fair valuation thereon, loans, or offers to loan, an amount equal to 75 per cent of the value so fixed, an applicant receives all that he is entitled to under the act, and his constitutional right is fully preserved.

The theory upon which the writ was issued was that the appraisers, and not the commission, were the final judges of the value of the property, and that in absence of fraud their appraisement was binding upon the commission. With this theory we cannot agree. In the absence of some statutory direction indicating that such was the intent of the legislature, that appraisers appointed by, answerable to, and removable at the pleasure of the commission, should have the power to override the judgment of the commission upon so important a question as this does not seem to us to be fair construction to be placed upon the act. As there was no allegation in the writ of bad faith or abuse of discretion by the commission, or that the commission was acting beyond its powers, and as *mandamus* will not lie to control the discretion of the commission while acting within its authorized powers, the demurrer should have been sustained.

For these reasons the order appealed from must be reversed, and the cause will be remanded with directions to sustain the demurrer and to dismiss the proceedings.

REVERSED AND REMANDED, WITH DIRECTIONS.